IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge William J. Martínez

Civil Action No. 19-cv-2087-WJM-SKC

DAVID DICKERSON,

     Plaintiff,

v.

BOARD OF TRUSTEES OF METROPOLITAN STATE UNIVERSITY OF DENVER,

     Defendant.

---

## ORDER GRANTING DEFENDANT'S MOTION TO DISMISS AND FOR SUMMARY JUDGMENT

---

This reverse sex discrimination case, which involves pendent claims for breach of contract, is before the Court on Defendant Board of Trustees of Metropolitan State University of Denver's ("Board" or "MSUD") Motion to Dismiss and for Summary Judgment ("Motion"). (ECF No. 43.) For the reasons explained below, the Motion is granted as to the federal claims, and the Court declines to exercise supplemental jurisdiction over the state law claims.

## I. STANDARD OF REVIEW

### A. Motion to Dismiss under Federal Rule of Civil Procedure 12(b)(1)

As courts of limited jurisdiction, federal courts may only adjudicate cases that the Constitution and Congress have granted them authority to hear. *See* U.S. Const. art. III, § 2; *Morris v. City of Hobart*, 39 F.3d 1105, 1111 (10th Cir. 1994). Statutes conferring jurisdiction on federal courts must be construed strictly. *See F&S Constr. Co. v. Jensen*, 337 F.2d 160, 161 (10th Cir. 1964).

Federal Rule of Civil Procedure 12(b)(1) empowers a court to dismiss a complaint for "lack of jurisdiction over the subject matter."  A Rule 12(b)(1) motion to dismiss "must be determined from the allegations of fact in the complaint, without regard to mere conclusionary allegations of jurisdiction."  *Groundhog v. Keeler*, 442 F.2d 674, 677 (10th Cir. 1971).  A party challenging the Court's jurisdiction may go beyond allegations contained in the complaint and challenge the facts upon which subject matter jurisdiction depends.  *See Holt v. United States*, 46 F.3d 1000, 1003 (10th Cir. 1995).  When reviewing a factual attack on subject matter jurisdiction, a district court may not presume the truthfulness of the complaint's factual allegations.  *See id.*  A court has wide discretion to allow affidavits, other documents, and may conduct a limited evidentiary hearing to resolve disputed jurisdictional facts under Rule 12(b)(1).  *See id.*

## B.    Summary Judgment

Summary judgment is warranted under Federal Rule of Civil Procedure 56 "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–50 (1986).  A fact is "material" if, under the relevant substantive law, it is essential to proper disposition of the claim.  *Wright v. Abbott Labs., Inc.*, 259 F.3d 1226, 1231–32 (10th Cir. 2001).  An issue is "genuine" if the evidence is such that it might lead a reasonable trier of fact to return a verdict for the nonmoving party.  *Allen v. Muskogee*, 119 F.3d 837, 839 (10th Cir. 1997).

In analyzing a motion for summary judgment, a court must view the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party. *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).  In addition, the

2

Court must resolve factual ambiguities against the moving party, thus favoring the right to a trial.  *See Houston v. Nat'l Gen. Ins. Co.*, 817 F.2d 83, 85 (10th Cir. 1987).

## II. BACKGROUND

### A.    Factual Allegations[1]

In April 2016, Dickerson applied for the position of Director of International Business Programs at MSUD, and by letter dated July 28, 2016, Ann B. Murphy, the Dean of the School of Business, offered Dickerson a twelve-month contract for the position beginning fall 2016.  (ECF No. 43 at 1 ¶ 1.)  The Director of International Business Programs was an administrator position that reported to Murphy.  (*Id.* ¶ 2.)  Dickerson accepted the offer on August 15, 2016.  (*Id.* at 2 ¶ 7.)

According to the Board, in September 2016, three female students reported incidents of Dickerson behaving inappropriately toward them to MSUD's Office of Equal Opportunity ("OEO").  (*Id.* at 2 ¶ 11.)  Dr. Percy Morehouse was the Director of the OEO and Assistant to the President, and he met with the students to hear their concerns.  (*Id.* at 2–3 ¶¶ 12–13.)  The essence of the students' complaints was that Dickerson made comments to them that made them uncomfortable and that they considered inappropriate.  (*Id.* at 3 ¶¶ 14–18.)

Following Morehouse's meeting with the students, on September 29, 2016, Morehouse and Murphy met with Dickerson to discuss the information they received from the three students.  (*Id.* at 4 ¶ 19.)  Morehouse gave Dickerson a strong verbal warning, and Murphy stressed that this type of behavior was unacceptable at MSUD.

---

[1]  The following factual summary is based on the parties' briefs on the Motion and documents submitted in support thereof.  These facts are undisputed unless attributed to a party or source.  All citations to docketed materials are to the page number in the CM/ECF header, which sometimes differs from a document's internal pagination.

(*Id.* at 4 ¶ 21; ECF No. 50 at 13 ¶ 8.)  After the meeting, Dickerson took the following online courses, as required: (1) Prevention - Discrimination & Sexual Violence; (2) Unlawful Harassment Prevention - Staff; and (3) Bullying Prevention.  (ECF No. 43 at 2 ¶ 22.)  Nothing was placed in Dickerson's personnel file as to any of the incidents or complaints, nor is there any reference to any of these incidents or complaints in any of his performance appraisals.  (ECF No. 50 at 13 ¶ 10.)

Dickerson felt discriminated against by having to deal with "the likes of the EO Office" and considered himself a victim of harassment.  (ECF No. 43 at 4 ¶¶ 23–24.)  He considered the students' allegations ludicrous, groundless, and ridiculous, and considered the meeting about them to be a public shaming.  (*Id.* at 5 ¶ 26.)

On May 15, 2017, Murphy offered Dickerson a tenure track position as an Assistant Professor in the Management Department to begin in the fall 2017.  (*Id.* at 5 ¶ 31.)  When Murphy made the faculty position offer to Dickerson, she was aware of the complaints made against him in 2016.  (ECF No. 50 at 18 ¶ 49.)  As Acting President, Provost Vicki Golich provided Dickerson with a contract in early July 2017.  (ECF No. 43 at 6 ¶ 36.)  Under the offer made to Dickerson, he would continue to work as the Director of International Business Programs but would also occupy a tenure track faculty position.  (ECF No. 50 at 15 ¶ 24.)  At MSUD, at each Board of Trustees meeting, a list of proposed new hires is presented, and the Board approves them.  (ECF No. 43 at 6 ¶ 37.)  However, according to the Board, Dickerson's contract was never approved by the Board of Trustees.  (*Id.* at 6 ¶ 38.)

According to the Board, in May 2017, Amber Billingsley, a female academic advisor/program assistant who worked with Dickerson, complained to the OEO office

that over the past months, Dickerson made comments to her that made her feel uncomfortable.  (*Id.* at 6–7 ¶ 39.)  An incident with Dickerson that occurred on May 25, 2017 made Billingsley feel uncomfortable and emotionally distressed, and she decided to file a formal complaint.  (*Id.* at 7 ¶¶ 41, 44.)

Also in May 2017, another female student complained to the OEO regarding concerns about Dickerson.  (*Id.* at 7 ¶ 46.)  According to the complaint, the student worked on various projects with Dickerson, and when they were finished, he asked to take her out to dinner so he could show his appreciation.  (*Id.* at 7 ¶ 47.)  She told him she was busy, but Dickerson continued to ask her out at least two additional times.  (*Id.*)  The student reported that Dickerson made other comments to her that she felt were inappropriate and that she wanted him to stop asking her out, as she felt uncomfortable and overpowered.  (*Id.* at 8 ¶ 52.)

On June 9, 2017, Morehouse and Murphy met with Dickerson to discuss these incidents.  (*Id.* at 9 ¶ 53.)  They told Dickerson that his comments were inappropriate and that he must cease and desist from making such comments.  (*Id.* at 9 ¶ 55.)  Further, Morehouse and Murphy notified Golich about the complaints.  (*Id.* at 10 ¶ 59.)  Morehouse, Murphy, and Golich decided they should meet with the General Counsel to determine what the next steps should be.  (*Id.* at 10 ¶ 60.)

On July 24, 2017, Janine Davidson became President of MSUD.  (*Id.* at 10 ¶ 61.)  At some point between August 10 and 15, 2017, Davidson, Golich, Murphy, Morehouse, and General Counsel David Fine met to discuss the 2016 and 2017 complaints against Dickerson and the fact that MSUD had offered Dickerson a contract.  (*Id.* at 10 ¶¶ 62–63.)  Davidson understood the complaints about Dickerson to concern multiple

inappropriate comments that appeared to create a pattern, and that there were complaints by more than one person that Dickerson said inappropriate things that made people feel threatened or uncomfortable.  (*Id.* at 10 ¶ 64.)  Davidson viewed Dickerson's conduct as inappropriate and potentially sexual harassment.  (*Id.* at 11 ¶ 66.)

Davidson made the final decision to revoke Dickerson's tenure track faculty position offer, and she decided not to recommend Dickerson to the Board of Trustees to be hired.  (*Id.* at 11 ¶ 68; ECF No. 50 at 15 ¶ 29.)  Davidson chose not to hire Dickerson because of the pattern of allegations against him and the likelihood of creating problems in the department and the potential for other allegations or lawsuits.  (ECF No. 43 at 11 ¶ 70.)  On August 15, 2017, Golich revoked the employment offer.  (*Id.* at 11 ¶ 71.)  In making the decision to revoke the offer, Davidson intended that Dickerson "be gone from both the faculty position and the Director of International Business Programs administrative position."  (ECF No. 50 at 17 ¶ 39.)  No appeal process was provided to Dickerson in connection with his separation from employment.  (*Id.* ¶ 37.)  The replacement hired for Dickerson in the tenure track faculty position was a female applicant, Dr. Gina Cook.  (*Id.* at 18 ¶ 46.)

**B.    Procedural History**

On July 19, 2019, Dickerson filed the Complaint.  (ECF No. 1.)  He brings four claims against the Board: (1) sex discrimination in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §2000e, *et seq.*, and Title IX of the Education Amendments of 1972, 20 U.S.C. §1681; (2) Fifth Amendment and Fourteenth Amendment Due Process Clause claims under 42 U.S.C. § 1983; (3) breach of express contract; and (4) breach of implied contract.  (*Id.*)  On September 11, 2019, the Board

filed the Answer.[2]  (ECF No. 14.)

On July 22, 2020, the Board filed the Motion.  (ECF No. 43.)  On August 25,

2020, Dickerson filed his response (ECF No. 50), to which the Board replied (ECF No.

60.)  Thus, the Motion is ripe for review.

## III. EVIDENTIARY ISSUES

At the summary judgment stage, evidence need not be submitted "in a form that

would be admissible at trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).

Parties may, for example, submit affidavits in support of summary judgment, despite the

fact that affidavits are often inadmissible at trial as hearsay, on the theory that the

evidence may ultimately be presented at trial in an admissible form.  *Bryant v. Farmers

Ins. Exch.*, 432 F.3d 1114, 1122 (10th Cir. 2005).  Nonetheless, "the content or

substance of the evidence must be admissible."  *Thomas v. Int'l Bus. Machs.*, 48 F.3d

478, 485 (10th Cir. 1995).  Thus, for example, at summary judgment a court should

disregard inadmissible hearsay statements contained in affidavits, as those statements

could not be presented at trial in any form.  *See Hardy v. S.F. Phosphates Ltd. Co.*, 185

F.3d 1076, 1082 n.5 (10th Cir. 1999).

The requirement that the substance of the evidence must be admissible is not

only explicit in Rule 56, which provides that "[s]upporting and opposing affidavits shall

. . . set forth such facts as would be admissible in evidence," Fed. R. Civ. P. 56(e), but

also implicit in a court's role at the summary judgment stage.  To determine whether

genuine issues of material fact make a jury trial necessary, a court necessarily may

---

[2] On December 3, 2020, the Court adopted the Amended Report and Recommendation
of United States Magistrate Judge S. Kato Crews (ECF No. 64), which recommended denying
the Board's motion to amend its Answer.  (ECF No. 65.)

consider only the evidence that would be available to the jury.  *See Truck Ins. Exch. v. MagneTek, Inc.*, 360 F.3d 1206, 1216 (10th Cir. 2004) (affirming summary judgment, in light of the available evidence, because "[j]ury verdicts may not be based on speculation or inadmissible evidence or be contrary to uncontested admissible evidence").  The Tenth Circuit reviews a district court's evidentiary rulings at the summary judgment stage for abuse of discretion.  *See Argo v. Blue Cross & Blue Shield of Kan., Inc.*, 452 F.3d 1193, 1199 (10th Cir. 2006) (citing *Jones v. Barnhart*, 349 F.3d 1260, 1270 (10th Cir. 2003)).

In his Response to Movant's Statement of Material Facts, Dickerson makes numerous evidentiary objections to the evidence that the Board cites.[3]  (*See* ECF No. 50 at 1–12.)  First, Dickerson objects to the Board's Exhibits E, F, and G (ECF Nos. 43-5, 43-6, 43-7), which are transcriptions of Morehouse's September 2016 conversations with the three female students who complained about Dickerson.  Dickerson objects on numerous evidentiary grounds, as follows:

> Plaintiff objects that the material cited to support paragraph 13 is not presented in a form that would be admissible at trial.  Specifically, the documents presented, Exhibits E, F and G, are entirely hearsay, from anonymous sources, and are inadmissible pursuant to Fed. R. Evid. 802 and 805.  The exhibits are also inadmissible on the basis of relevance, unfair prejudice, and confusion under Fed. R. Evid. 402 and 403.  The documents are also inadmissible on the basis of a lack of personal knowledge under Rule 602 and for inadequate authentication and identification under Rule 901.

(ECF No. 50 at 2 ¶ 13.)

Despite Dickerson's arguments, the Court agrees with the Board's explanation of

---

[3] While Dickerson makes numerous evidentiary objections, the Court only addresses those relevant to the resolution of the Motion.

the admissibility of these exhibits.  (See ECF No. 60 at 3–5.)  As the Board points out,

Exhibits E, F, and G are not hearsay because they are not offered for the truth of the

matter asserted.  Rather, they are offered for their effect on the listener, as they explain

the action Morehouse took in admonishing Dickerson and requiring him to take the

online training courses, and Davidson's later decisions not to submit the 2017 contract

to the Board of Trustees for approval and, ultimately, to revoke the offer.  *See United

States v. Lambinus*, 747 F.2d 592, 597 (10th Cir. 1984) (finding statements offered for

their effect on listener or to explain the listener's later actions are not hearsay); *Zamora

v. Bd. of Educ. for Las Cruces Pub. Schs.*, 553 F. App'x 786, 790 (10th Cir. 2014)

("Statements offered for the effect on the listener, however, are generally not hearsay.").

      In addition, as present sense impressions, these exhibits are also exceptions to

the hearsay rule.[4]  Here, the female students contacted their advisor after their

respective interactions with Dickerson, and the OEO immediately scheduled the

interviews with the students.  (ECF No. 60-1 ¶¶ 2, 10 ("Exhibit T").)[5]  Morehouse

explains that the transcribed interviews are records of a regularly conducted activity.[6]

(*Id.* ¶ 10.)

---

[4] "The following are not excluded by the rule against hearsay, regardless of whether the declarant is available as a witness: (1) Present Sense Impression. A statement describing or explaining an event or condition, made while or immediately after the declarant perceived it." Fed. R. Evid. 803 (1).

[5] To the extent Dickerson might also object to the admissibility of Exhibit T, which is Morehouse's Declaration, the Court finds it, too, is not hearsay, as it is not offered for the truth of the matter asserted.  Rather, Morehouse's recitation explains the actions he took with respect to the students' complaints and their subsequent effect on decisions taken related to Dickerson's employment.

[6] Federal Rule of Evidence Rule 803(6) provides an exception to the hearsay rule for business records if they are "kept in the course of a regularly conducted activity of a business" and "making the record was a regular practice of that activity."  Fed. R. Evid. 803(6).

Finally, Rule 403 permits the exclusion of relevant evidence if the probative value of the evidence is substantially outweighed by the danger of unfair prejudice or jury confusion.  Fed. R. Evid. 403.  The Tenth Circuit regards the power to exclude relevant evidence as extraordinary, to be exercised sparingly.  *See Boardwalk Apartments, L.C. v. State Auto Prop. & Cas. Ins. Co.*, 816 F.3d 1284, 1289 (10th Cir. 2016).  "In deciding whether to exercise this extraordinary power, the district court must give the evidence its maximum reasonable probative force and the minimum reasonable risk of unfair prejudice or confusion."  *Id.* (citing *Deters v. Equifax Credit Info. Servs., Inc.*, 202 F.3d 1262, 1274 (10th Cir. 2000); *SEC v. Peters*, 978 F.2d 1162, 1171 (10th Cir. 1992)).  Here, evidence of the students' complaints is probative because they form the reason Morehouse admonished Dickerson and required him to enroll in training classes.  The students' statements in the transcriptions also informed the decisions not to recommend the 2017 contract for Board approval and to revoke the offer of employment.  At this stage of the litigation, Exhibits E, F, and G are proper for the Court to consider and unlikely to cause confusion.

Next, Dickerson objects to the Board's Exhibit N (ECF No. 43-14)—an e-mail containing Billingsley's complaint against Dickerson, which was routed to Morehouse—on the same grounds:

> Specifically, the document presented, Exhibit N, is hearsay and is inadmissible pursuant to Fed. R. Evid. 802 and 805. The exhibit is also inadmissible on the basis of relevance, unfair prejudice, confusion under Fed. R. Evid. 402 and 403. The exhibit is also inadmissible on the basis of a lack of personal knowledge under Rule 602 and for inadequate authentication and identification under Rule 901.

(ECF No. 50 at 6 ¶ 39.)  As explained above regarding Exhibits E, F, and G, Exhibit N is

similarly not hearsay.  It is not being offered for the truth of the matter asserted, but to show its effect on Morehouse and the reasons the Board later decided to revoke the offer of employment to Dickerson.  In addition, as Billingsley submitted her report within one day of her interaction with Dickerson, it is an exception to the hearsay rule as a present sense impression.  Morehouse explains that Exhibit N is a record of a regularly conducted activity.  (ECF No. 60-1 ¶ 13.)  As such, the Court concludes Exhibit N is properly before the Court for consideration on summary judgment.

Finally, Dickerson objects to the Board's Exhibit O (ECF No. 43-15)—notes of the June 2017 meeting that Morehouse and Murphy had with a student complaining about Dickerson's behavior—on the same grounds:

> Specifically, the document presented, Exhibit O, is hearsay and is inadmissible pursuant to Fed. R. Evid. 802 and 805. The exhibit is also inadmissible on the basis of relevance, unfair prejudice, confusion under Fed. R. Evid. 402 and 403. The exhibit is also inadmissible on the basis of a lack of personal knowledge under Rule 602 and for inadequate authentication and identification under Rule 901.

(ECF No. 50 at 8 ¶ 46.)  For the same reasons explained above, the Court concludes Exhibit O is properly before the Court for consideration on summary judgment.

## IV. ANALYSIS

### A.     Sex Discrimination - Titles VII and IX

#### 1.     Legal Standard

Under Title VII, it is considered an unlawful employment practice for an employer to "discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e–2(a)(1).

When a plaintiff seeks to establish a case of disparate treatment using

circumstantial evidence, the three-step burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973), is applied.  Under the *McDonnell Douglas* framework, the plaintiff bears the initial burden of establishing a *prima facie* case of discrimination.  411 U.S. at 802.  If the plaintiff meets this burden, the burden of production then shifts to the defendant to provide a legitimate, non-discriminatory reason for the employment action.  *Id.* at 802–03.  Finally, the burden shifts back to the plaintiff to show that the defendant's reasons were a pretext for unlawful discrimination.  *Id.* at 804.

Typically, to establish a *prima facie* case of discrimination the plaintiff must show that (1) he belongs to a protected class; (2) he suffered an adverse employment action; and (3) the adverse employment action was suffered under circumstances giving rise to an inference of discrimination.  *See, e.g.*, *E.E.O.C. v. Horizon/CMS Healthcare Corp.*, 220 F.3d 1184, 1192 (10th Cir. 2000).  However, when the plaintiff brings a reverse discrimination claim, the *prima facie* case must be adjusted to account for the plaintiff's historically favored status.  *See Livingston v. Roadway Exp., Inc.*, 802 F.2d 1250, 1252 (10th Cir. 1986).  In such circumstances, the plaintiff "must, in lieu of showing that he belongs to a protected group, establish background circumstances that support an inference that the defendant is one of those unusual employers who discriminates against the majority."  *Notari v. Denver Water Dep't*, 971 F.2d 585, 589 (10th Cir. 1992); *see also Adamson v. Multi Cmty. Diversified Servs., Inc.*, 514 F.3d 1136, 1149 (10th Cir. 2008).

Alternatively, a plaintiff alleging reverse discrimination may establish his *prima facie* case by presenting direct evidence of discrimination or "indirect evidence sufficient

to support a reasonable probability[ ] that but for the plaintiff's status" he would not have suffered the adverse employment action.  *See Notari*, 971 F.2d at 590.

If a plaintiff claiming reverse discrimination establishes a *prima facie* case under the formulation approved in *Notari*, then the remainder of the *McDonnell Douglas* paradigm applies.  *Bowdish v. Fed. Express Corp.*, 699 F. Supp. 2d 1306, 1320 (W.D. Okla. 2010) (citing *Notari*, 971 F.2d at 591).  Under this analysis, the burden shifts to the employer to articulate a legitimate, non-discriminatory reason for its adverse employment action, and if it does so, the plaintiff then has the burden of proving that such reason is pretextual.  *Id.* (citing *McDonnell Douglas*, 411 U.S. at 802–04; *Young v. Dillon Co.*, 468 F.3d 1243, 1250 (10th Cir. 2006)).

A plaintiff may demonstrate pretext by revealing "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons."  *Argo*, 452 F.3d at 1203.  However, in determining whether the employer's proffered reason is pretextual this Court must "examine the facts as they appear to the person making the decision."  *Watts v. City of Norman*, 270 F.3d 1288, 1295 (10th Cir. 2001) (internal quotation marks and citation omitted).  "The relevant inquiry is not whether the employer's proffered reasons were wise, fair or correct, but whether it honestly believed those reasons and acted in good faith upon those beliefs."  *Rivera v. City & Cnty. of Denver*, 365 F.3d 912, 924–25 (10th Cir. 2004) (internal quotations, citations, and alterations omitted).  "An articulated motivating reason is not converted into pretext merely because, with the benefit of

hindsight, it turned out to be poor business judgment.  The test is good faith belief."
*McKnight v. Kimberly Clark Corp.*, 149 F.3d 1125, 1129 (10th Cir. 1998) (internal citation omitted).

      2.   <u>Analysis</u>

          a.   *Title VII and Title IX*

In his first claim, Dickerson alleges discrimination under Title VII and Title IX. (ECF No. 1.)  In his response, Dickerson argues that the Board's Motion only addresses the Title VII claim and does not address the Title IX claim.  (ECF No. 50 at 22.)  Thus, Dickerson contends that regardless of the Court's ruling on the Title VII claim, the Title IX claim remains pending.  (*Id.*)

Dickerson is incorrect.  The Board has moved for summary judgment on Dickerson's first claim in its entirety.  (*See* ECF No. 43 at 35 ("MSUD . . . requests that the Court grant [the Motion] and dismiss Plaintiff's Complaint *in its entirety* and with prejudice . . .") (emphasis added).)  The Tenth Circuit has found that the *McDonnell Douglas* framework applies both to the Title IX and Title VII sex discrimination claims. *See Hiatt v. Colo. Seminary*, 858 F.3d 1307, 1315–16 n.8 (10th Cir. 2017) (citing *Bird v. W. Valley City*, 832 F.3d 1188, 1200 (10th Cir. 2016) (Title VII sex discrimination claim); *Gossett v. Okla. ex rel. Bd. of Regents for Langston Univ.*, 245 F.3d 1172, 1176 (10th Cir. 2001) ("Courts have generally assessed Title IX discrimination claims under the same legal analysis as Title VII claims.")).  Therefore, the Board's Motion and the Court's forthcoming analysis apply to Dickerson's sex discrimination claim in its entirety.

          b.   *Direct Evidence*

"[A] plaintiff may recover if the plaintiff can demonstrate he or she is the victim of reverse discrimination by 'direct evidence of discrimination, or indirect evidence

sufficient to support a reasonable probability, that but for the plaintiff's status the challenged employment decision would have favored the plaintiff.'" *McGarry v. Bd. of Cnty. Comm'rs of Cnty. of Pitkin*, 175 F.3d 1193, 1199 (10th Cir. 1999) (quoting *Notari*, 971 F.2d at 590). "Proof by direct evidence requires evidence that the actual motive behind the termination of [the plaintiff's] employment was discriminatory animus." *Mitchell v. City of Wichita, Kan.*, 140 F. App'x 767, 778 (10th Cir. 2005) (citation omitted).

Dickerson argues that direct evidence exists in this case. (ECF No. 50 at 25.) Specifically, he contends that he

> was terminated (or his contract offer was revoked), solely because he was deemed, without any investigation, without any hearing, without any opportunity to cross-examine or even know the identity of his accusers, to have been a male authority figure who made inappropriate comments to female students. That is, Dr. Dickerson's sex is an inescapable predicate to the adverse employment action which was taken against him.

(*Id.*) Dickerson cites no case law demonstrating that such facts constitute direct evidence.

The Court finds no direct evidence of discrimination here. "A statement that can plausibly be interpreted two different ways—one discriminatory and the other benign—does not directly reflect illegal animus, and, thus, does not constitute direct evidence." *Vaughn*, 537 F.3d at 1154–55. As an initial matter, Dickerson has offered no statements that he contends are direct evidence of discrimination. Instead, he attempts to recast typical circumstantial evidence as direct evidence. The Board's action in revoking Dickerson's contract because Dickerson (a man) made allegedly inappropriate comments to women is not, on its face, *direct* evidence of sex discrimination, because

at no time was Dickerson expressly informed that his contract was being revoked because he was a man.  In these circumstances, evidence which falls short of such a transparent expression of gender-based animus is *not* direct evidence of reverse discrimination against Dickerson.  Taking Dickerson's argument to its logical conclusion, any man who suffers an adverse employment action, without more, would have direct evidence of reverse sex discrimination, which cannot possibly be the case under the case law which has developed on this issue for decades.  The reason for the Board's action is open to interpretation and is, therefore, not direct evidence.

Therefore, the Court turns to whether Dickerson has sufficiently shown circumstantial evidence of discrimination.

### c.    *Circumstantial Evidence*

To determine whether a plaintiff suffered an adverse employment action, courts must take a "case-by-case approach," analyzing the unique factors in each situation. *Sanchez v. Denver Pub. Schs.*, 164 F.3d 527, 531 (10th Cir. 1998).  One factor a court uses to determine an adverse action is whether the action causes "harm to future employment prospects."  *Hillig v. Rumsfeld*, 381 F.3d 1028, 1031 (10th Cir. 2004) (citation omitted).  An employer's act must do more than *de minimis* harm, and must be "materially adverse to the employee's job status."  *Id.* at 1033.  In other words, adverse employment actions "are those that cause a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision that causes a significant change in benefits."  *Stinnett v. Safeway, Inc.*, 337 F.3d 1213, 1217 (10th Cir. 2003).  "Minor employment actions which make an employee unhappy are not sufficiently adverse as to form grounds for a discrimination suit."  *Aluru v. Anesthesia Consultants*, 176 F. Supp. 3d 1116, 1125 (D.

Colo. 2016) (citation omitted).

The Court has already set forth the standard for evaluating whether a defendant's proffered legitimate, non-discriminatory reasons for taking an action are pretextual. *See supra* Part IV.A.1.

Dickerson's discovery responses identify 13 actions by MSUD that Dickerson alleges are "indicative of the discriminatory attitude of MSUD toward [Dickerson] on the basis of sex." (ECF No. 43-17 at 4–6.) The Court has examined these actions and has identified numerous actions which are not adverse employment actions and thus do not satisfy Dickerson's *prima facie* burden. For those actions which do at least arguably rise to the level of an adverse employment action, the Court explains why Dickerson has failed to demonstrate that the reasons articulated by the Board for taking those actions are a pretext for reverse sex discrimination. The Court examines each of the alleged discriminatory actions taken by the Board in turn.

> (1) What was outlined in the EEOC Title VII complaint vs. MSU Denver; the misrepresentation of facts in this report to a EEOC Federal Agency by Deputy General Counsel Stancil Esq., (MSUD Position Statement; page 4; paragraph 3); They discriminated against me by denying my Title IX rights versus the female gender.

There is no evidence that a potential error or misstatement by Stancil in the Board's response to Dickerson's EEOC complaint had any effect on his employment. To the contrary, the response was provided *after* all employment actions concerning Dickerson occurred, so it is unclear how Stancil's words could constitute an adverse employment action.

Consequently, the Court finds this is not an adverse employment action, and Plaintiff's *prima facie* case of discrimination on this basis fails.

> (2) MSUD was non-compliant with recruitment policies regarding the advertisement of the position, establishing a hiring committee, conducting interviews and selecting the preferred candidate.  This was afforded to all of the female Assistant and Associate Professors[.]

As the Board explains, it hired Dickerson through a search for the administrator position he applied for in 2016.  When Dickerson asked for a faculty position, Murphy accommodated that request without needing to perform a search that was consistent with recruitment policies.  She had no need to do so; Dickerson already worked at MSUD.  Moreover, Dickerson was initially offered the position.  As the Board states, "[i]f anything, he received preferential treatment because had MSUD required Plaintiff to give up his administrator position and apply for a faculty position, he might not have been the successful candidate."  (ECF No. 43 at 17.)

In response, Dickerson only states that "It is relevant to discriminatory intent, that MSUD failed to comply with its own recruitment policies in the process of hiring Dr. Dickerson in 2016, even though it complied with such policies for all female assistant and associate professors."  (ECF No. 50 at 24.)

Given the Board's explanation that *had* it required Dickerson to relinquish his administrator position to apply for a faculty position, Dickerson might not have gotten the job *and* he would have given up his administrator position, the Court finds this allegation does not constitute an adverse employment action.  To the contrary, it appears as though the Board's process benefitted Dickerson.  In addition, Dickerson has failed to set forth any evidence demonstrating that the Board's reason for not following its recruitment policies and conducting a search was pretext for discrimination.

> (3) My direct report was to the Dean of the College of Business as the Director, International Business Programs,

> and it was promised that my Administrative contract would
> conclude when the Faculty contract would begin on August
> 1, 2017.  My new contract would now have me as a faculty
> member and Director of International Business Programs,
> but reporting to Dr. Gilliard of the Management Department
> and not to the Dean.  Dr. Gilliard wanted to control me by
> controlling the budget because she wanted her 'baby' back -
> International Business Programs.

In her Declaration, Murphy explains that no individual faculty member reports to her.  (ECF No. 43-19 ¶ 3.)  Rather, her direct reports are the associate deans, the department chairs, a budget administrator, and a few other professional staff positions.  (*Id.*)  Faculty members report to their department chairs.  (*Id.*)  Because Dickerson requested a faculty position in the management Department, it was appropriate that he report to the department's chair, Dr. Deborah Gilliard.  (*Id.*)  In addition, Dickerson requested the faculty position.  Dickerson points to no evidence that Gilliard requested supervision over Dickerson.

Consequently, the Court finds this allegation is not an adverse employment action, and Dickerson's *prima facie* case of discrimination on this basis fails as well. Moreover, there was a legitimate, non-discriminatory reason for Dickerson to report to Gilliard and not Murphy, and Dickerson has failed to show that this reason was pretext for discrimination.

> (4) I had requested the Dean prior to employment for
> measurement parameters which followed after I started
> employment. All female faculty Administrators had faculty
> contracts with provisions that they could return to teaching,
> but instead, I was provided an Administrative contract with
> teaching responsibilities. The President, Janine Davidson,
> Vicki Golich, Ann Murphy and Deborah Gilliard all have
> faculty contracts and/or provisions in an Administrative
> contract that allows them to return to teaching. With me, they
> provided me only an Administrative contract with a teaching
> provision.

In her Declaration, Murphy explains that Dickerson was an administrator who already had teaching duties, so there was no need to have a provision which would have allowed him to return to teaching in his contract.  (ECF No. 43-19 ¶ 6.)  Moreover, the Court notes that Dickerson accepted this offer.  He does not state that he requested and was denied such a provision, and even if that scenario occurred, he nonetheless accepted the contract.

In his response, Dickerson only states that "It is relevant to discriminatory intent, that, while female faculty administrators had fall back positions in their contracts to teaching jobs, [he] was only offered an administrative contract, without such a 'retreat line.'"  (ECF No. 50 at 24.)

Despite Dickerson's conclusory statement, the Court fails to discern any adverse employment action in the Board's offered contract.  Moreover, the Board has offered a legitimate, non-discriminatory reason for the contract provisions in the female faculty's contracts and why the Board found it unnecessary to offer Dickerson a similar provision, which Dickerson has failed to show was pretext for discrimination.

> (5) I had all of the qualifications for an appointment to a tenured Associate Professor of Marketing and International Business based upon my academic and professional experience, but I was appointed as an Assistant Professor.  I was not offered an Assistant Professor AACSB International recommended salary that is offered to tenure-track faculty members of an AACSB accredited Business School[.]

In the Motion, the Board explains that faculty must earn tenure, and Dickerson was not a tenured faculty member at any of his previous institutions.  (ECF No. 43 at 20.)  Moreover, Murphy states in her Declaration that Dickerson never asked her about the possibility of being an associate, rather than an assistant professor.  (ECF No. 43-

19 ¶ 7.)  And again, the Court notes that Dickerson *accepted* the offer of employment as an assistant professor.  He was free to decline the offer and wait for an associate position offer at MSUD or another university.  Further, Murphy explains in her Declaration that MSUD sets salaries based on data from the College and University Professional Association ("CUPA").  (*Id.* ¶ 8.)  No one at MSUD has a salary set by the recommendations of the AACSB International.  (*Id.*)

In his response, Dickerson only states that "[i]t is of course relevant and significant from the point of view of damages that Dr. Dickerson was qualified for appointment to an associate professor of marketing position, but was appointed instead as an assistant professor at a lesser rank and salary, such decision being set by his female superiors."  (ECF No. 50 at 24.)

Given the foregoing, the Court finds this allegation is not an adverse employment action and does not establish a *prima facie* case of discrimination.  Moreover, the Board has proffered a legitimate, non-discriminatory reason for Dickerson to receive an offer as an assistant professor with a salary set by the CUPA, and Dickerson has failed to reply with evidence that the Board's reason was pretext for discrimination.

> (6) During the course of my employment, I was requested to attend a Costa Rica trip for a course taught by a female Professor.  She was paid for the course, but I was neither paid nor provided a course reduction, or at least a stipend.

In her Declaration, Murphy explains that Dickerson did not receive a salary supplement for the Costa Rica trip because administrators do not receive salary supplements for activities such as accompanying the instructor of record.  (ECF No. 43-19 ¶ 9.)

In his response, Dickerson only states that "it is a demonstration of discriminatory

intent that [he] was tapped to conduct a teaching trip to Costa Rica, where the female professor involved was paid for the course, but he was not."  (ECF No. 50 at 24.)

The Court finds this action was not an adverse employment action, and even if it were, Dickerson has failed to show that the legitimate, non-discriminatory reason offered by the Board for its failure to pay Dickerson a stipend was pretext for discrimination.

> (7) During the course of my employment, I was being treated by the Dean, Ann Murphy and the EO Vice President with threats on how I have to speak with someone, and I even asserted my rights to be a citizen on and off the campus. It was as if they were on a 'Witchhunt' looking for a problem with me. This was three different occasions over nothing. There was a clear non-compliance with policy, but I ignored it and later realized that it was bullying and/or intimidation on their part. I never received a copy of a complaint or charge, but then I am being offered an Assistant Professor title and low salary. Who is the victim here? What was being done to protect me?

In the Motion, the Board explains that the 2016 and 2017 meetings between Dickerson, Morehouse, and Murphy were "necessary to address student and staff complaints," which the *students* brought to the OEO—not the other way around.  (ECF No. 43 at 21.)  Dickerson has presented no evidence that the meetings occurred for another reason or that they involved bullying or intimidation.  The Court finds that the Board has presented a legitimate, non-discriminatory reason for the meetings, and Dickerson has failed to show that the reason was pretext for discrimination.

> (8) My termination and banishment from campus was non-compliant with University Policy and I was denied due process.  Dr. Ann Murphy, Dr. Vicki Golich, Dr. Deborah Gilliard and Dr. Janine Davidson know that grievance procedures should be consistent with the principles of due process, that are available to everyone.

The Board concedes that the decision to revoke the 2017 offer of employment was an adverse employment action.  (ECF No. 43 at 22.)  Nonetheless, the Board proffers a legitimate, non-discriminatory reason for its decision, namely that "Davidson understood the complaints about [Dickerson] to create a pattern, and there were complaints by more than one person of [Dickerson] saying inappropriate things that made people feel threatened or uncomfortable."  (*Id.* (citing ECF No. 43-11 at 8).)  Davidson concluded that Dickerson's conduct was inappropriate and potentially sexual harassment.  (*Id.* (citing ECF No. 43-11 at 12).)  Given the circumstances, Davidson chose not to hire Dickerson because of the pattern of allegations against him and the likelihood of creating problems in the department and the potential for other allegations or lawsuits.  (*Id.* (citing ECF No. 43-11 at 11).)

Dickerson has failed to set forth evidence demonstrating that the Board's reason for revoking his contract was pretext for discrimination based on sex.  His repeated denial that he engaged in any misconduct does not constitute evidence sufficient to refute the Board's reason for its actions.  (See ECF No. 50 at 26–27.)  The relevant inquiry is whether the Board had a *good faith belief* in its reasons for taking action against Dickerson.  *See Rivera*, 365 F.3d at 924–25; *McKnight*, 149 F.3d at 1129.  It is insufficient to demonstrate that the Board's reasons were unwise, unfair, or incorrect.  *See Rivera*, 365 F.3d at 924–25.  Instead, Dickerson must put forward some evidence that the Board's reason for revoking his contract is "unworthy of belief," and that the Board was actually motivated by discriminatory animus.  *Montes v. Vail Clinic, Inc.*, 497 F.3d 1160, 1173 (10th Cir. 2007).  Dickerson has failed to meet this burden, as he has failed to establish that the Board's reason is unworthy of belief or that its decision to

revoke his contract was related to his sex at all.

> (9) President Jordan's attorney, Ms. Loretta Martinez, telephoned me about Vicente Fox's visit that I organized because President Davidson is in Mexico with President Fox, and just learned that he is already coming to MSU Denver, and she wanted to extend the invitation.  The PR plan was in place, and the next thing I know Dr. Davidson and Dr. Ann Murphy are taking the credit.

Dickerson's perception that Davidson or Murphy may have taken credit for an

event he organized does not rise to the level of an adverse employment action.

> (10) After having organized the visit of the Russian Consul General, I then have a Professor from the History Department complaining, but then Dr. Davidson, who was not then the official appointed President, enters the conversation requesting Dr. Vicki Golich for more information.  And, then I am in a position of trying to defend myself again. It was just perpetual 'female' harassment.

Dickerson's perception that another professor or Davidson complaining in some

manner or requesting more information does not rise to the level of an adverse

employment action.  Moreover, in her Declaration, Murphy explains that she did *not* find

fault with Dickerson in this instance, and neither Davidson nor Golich expressed

criticism to her about Dickerson's work on the Consul General's visit.  (ECF No. 43-19 ¶

12.)

> (11) I was called to Percy Morehouse's Office on three different occasions, with Dean, Ann Murphy, without having been served a formal complaint or charge.  Hence, I was walking to his office across campus with Dean Ann Murphy to his office.  Dr. Morehouse was intimidating and telling me that I have a complaint against me (in EEOC Complaint), without ever showing me a complaint.  They were ludicrous and he did not follow any of the set procedures nor did he announce that he was a Title IX Director.

This allegation essentially repeats #7, which the Court addressed above.

> (12) Dean Ann Murphy offered me a less salary than what I
> was earning to perform two jobs under the direction of Dr.
> Deborah Gilliard.

In the Motion, the Board explains that the Director of International Business Programs aspect of the 2017 faculty position was an increase in the typical service requirement, so Murphy reduced Dickerson's teaching requirement from four classes to three.  (ECF No. 43 at 24–25; ECF No. 43-10.)  In addition, the Dean's office offered the opportunity for Dickerson to teach two summer courses as well as receive the equivalent pay as if he taught a third summer course to cover the expected activities as Director, for a total summer pay opportunity of 25% of the base salary.  (ECF No. 43-10 at 1–2.)  Accordingly, Dickerson's previous $122,500 administrator salary was not reduced.  (ECF No. 43-19 ¶ 13.)

In his response, Dickerson states, "It is of course relevant and significant from the point of view of damages that Dr. Dickerson was qualified for appointment to an associate professor of marketing position, but was appointed instead as an assistant professor at a lesser rank and salary, such decision being set by his female superiors."  (ECF No. 50 at 24.)

The Court finds that Dickerson has failed to provide evidence that his salary was reduced, and thus there was no adverse employment action.

> (13) The Affirmative Action Policies at the University target
> hiring of minorities and women as outlined in EEOC
> complaint[.]

As the Board explains in the Motion, even if MSUD had a policy of providing opportunity to diverse candidates, including women, Murphy offered Dickerson—a male—the 2016 administrator position and the 2017 tenure track faculty position.  (ECF

No. 43 at 25.)

In his response, Dickerson states that "the Affirmative Action Plan of the University demonstrates that it is that unusual employer who discriminates against the majority, in the sense of targeting the hiring of women into faculty positions at the College of Business, at the expense of qualified male employees (Stmt. Additional Facts, ¶ 53). The MSUD campus itself was predominantly female, including the graduate student body."  (ECF No. 50 at 26.)

Given that the Board hired Dickerson in 2016 and—but for the student and staff complaints against Dickerson based on his behavior—planned to hire him in 2017, the Court finds that Dickerson has not shown that the affirmative action policies somehow constitute an adverse employment action against him.

In sum, the Court finds that no genuine dispute exists regarding the Board's actions against Dickerson, and the Board is entitled to summary judgment on Dickerson's sex discrimination claim under Titles VII and IX.

> d.    *The Board is Not "One of Those Unusual Employers"*

To the extent Dickerson rejects the foregoing analysis and doubles down on his contention that "the question presented in this case is not whether each individual incident parsed by Defendant in its Motion was discriminatory in and of itself, but rather whether, considering all of the events which occurred, Defendant discriminated against Dr. Dickerson with regard to his compensation or the other terms, conditions, and privileges of his employment," his argument is unavailing.  (ECF No. 50 at 23.)

Even assuming *arguendo* his framing of the issues was correct, he has failed to meet his burden to "establish background circumstances that support an inference that the defendant is one of those unusual employers who discriminates against the

majority."  *Notari*, 971 F.2d at 589.  The Court has found that each alleged discriminatory incident by the Board is either not an adverse employment action or that a legitimate, non-discriminatory reason supports each decision, policy, or action.  The remainder of Dickerson's allegations are merely conclusory statements and speculation that the Board engaged in actions to victimize Dickerson based on the fact that he is male.  *See Argo*, 452 F.3d at 1201 (defendant hired plenty of men and the male plaintiff "has introduced not a whit of statistical or even anecdotal evidence that men suffered adverse treatment as a class in the workplace"); *Livingston*, 802 F.2d at 1253 (male plaintiff did not offer any other background facts supporting an inference that the defendant is one of those unusual employers that discriminate against the majority); *see also Durant v. MillerCoors, LLC*, 415 F. App'x 927, 932 (10th Cir. 2011) (male plaintiff did not adduce evidence to show disparate treatment, nor did he proffered evidence showing background circumstances to support a suspicion that the defendant is an unusual employer who discriminates against the majority).  The Court finds no basis to conclude that the Board is the unusual employer that discriminates against the majority.

**B.    42 U.S.C. § 1983 - Fifth[7] and Fourteenth Amendment Due Process**

The Board argues that the Court lacks subject-matter jurisdiction over Dickerson's § 1983 claim, as it is barred by the Eleventh Amendment to the United States Constitution.  (ECF No. 43 at 26–31.)  The Court agrees.

The Eleventh Amendment provides: "The Judicial power of the United States

---

[7] The Complaint inexplicably purports to bring the § 1983 claim under the Fifth Amendment Due Process Clause, though the lawsuit is brought against a university which Dickerson never asserts is a federal entity.  Rather, in the response brief, Dickerson implies, without evidence, that MSUD is part of a county or municipal corporation.  (*See* ECF No. 50 at 28 ("While it is true that the Eleventh Amendment bars suits in federal court against states and state officials, this prohibition does not extend to counties and similar municipal corporations.").)  Thus, Dickerson's Fifth Amendment claim fails on its face.

shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State."  U.S. Const. amend. XI.  This immunity extends to suits by citizens against their own state or its agencies in federal court.  *Johns v. Stewart*, 57 F.3d 1544, 1552 (10th Cir. 1995).  "Only a state or 'arms' of a state may assert the Eleventh Amendment as a defense to suit in federal court."  *Sutton v. Utah State Sch. for Deaf & Blind*, 173 F.3d 1226, 1232 (10th Cir. 1999).

MSUD is a state institution of higher education, established in the Colorado Constitution and by state statute.  *See* Colo. Const. art. VIII, § 5; Colo. Rev. Stat. §§ 23-1-101, 23-54-101 to -104.  Courts have repeatedly found that the MSUD is an arm, or extension, of the State of Colorado.  *See, e.g.*, *Thornton v. Kaplan*, 937 F. Supp. 1441, 1448 (D. Colo. 1996) (holding that the University, then known as Metropolitan State College of Denver, is entitled to Eleventh Amendment immunity) (citing *Hamilton Mfg. Co. v. Trs. of the State Colleges in Colo.*, 356 F.2d 599 (10th Cir. 1966) (holding that a suit against Trustees of the State Colleges in Colorado, predecessor of Board of Trustees of Metropolitan State University of Denver, is essentially a suit against the State of Colorado)).  In fact, as recently as April 2020, another judge of this District found that "the Board is an arm of the State of Colorado and therefore may invoke Eleventh Amendment sovereign immunity."[8]  *Corrigan v. Bd. of Trs. of Metro. State Univ. of Denver*, 2020 WL 5536494, at *4 (D. Colo. Apr. 22, 2020), report and recommendation adopted, 2020 WL 3567049 (D. Colo. July 1, 2020) (*comparing* Colo. Rev. Stat. § 23-54-102(6) (transferring all duties and powers formerly performed by the

---

[8] In making this finding, the *Corrigan* court noted that there appeared to be no dispute that the Board is an arm of the State of Colorado.  *Corrigan*, 2020 WL 5536494, at *4.

trustees of the state colleges in Colorado to the Board) *with McLaughlin v. Bd. of Trs. of State Colleges of Colo.*, 215 F.3d 1168, 1170 (10th Cir. 2000) (holding that the Board of Trustees of State Colleges of Colorado waived its sovereign immunity by removing the plaintiff's § 1983 claims to federal court); *cf. Harrison v. Univ. of Colo. Health Scis. Ctr.*, 337 F. App'x 750, 753 (10th Cir. 2009) (concluding that the University of Colorado was an arm of the state given that the Colorado Constitution considers educational institutions supported by the State a State institution, and that this included divisions and employees in their official capacity within the University of Colorado)).

Further, Dickerson's argument that the Rule 12(b)(1) motion is untimely is wholly without merit (ECF No. 50 at 27–29), as subject-matter jurisdiction may be challenged by a party or raised *sua sponte* by the Court at any point in the proceeding.  *See Am. Fire & Cas. Co. v. Finn*, 341 U.S. 6, 16–19 (1951).  And for the reasons explained above, his arguments that MSUD is not an arm of the State of Colorado are similarly without merit.  (ECF No. 50 at 27–29.)

Consequently, this Court lacks subject-matter jurisdiction over Dickerson's § 1983 claim and will dismiss it without prejudice.

## C. Breach of Express and Implied Contract Claims

Because the Court has found that the Board is entitled to summary judgment on both of Dickerson's federal claims, it declines to exercise supplemental jurisdiction over his breach of contract claims.  This Court "may decline to exercise supplemental jurisdiction" over a state-law claim if:

> (1) the claim raises a novel or complex issue of State law,
> (2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction,
> (3) the district court has dismissed all claims over which it has original jurisdiction, or

> (4) in exceptional circumstances, there are other compelling
> reasons for declining jurisdiction.

28 U.S.C. § 1367(c).

Here, the third option applies because this Court will dismiss Claims 1 and 2, which are the only claims over which the Court has original jurisdiction.  In such a situation, the Court should "generally decline to exercise [supplemental] jurisdiction [over the remaining claims] . . . absent compelling reasons to the contrary."  *Brooks v. Gaenzle*, 614 F.3d 1213, 1230 (10th Cir. 2010) (internal quotation marks omitted).  Dickerson offers no compelling reasons (or any reasons at all) why the Court should retain jurisdiction over his breach of contract claims, and the Court can find none.

Accordingly, Claims 3 and 4 will be dismissed without prejudice to refiling in state court.  *See Brooks*, 614 F.3d at 1230; *see also* 28 U.S.C. § 1367(d) (tolling statute of limitations on state-law claims for thirty days after a federal court declines supplemental jurisdiction).

## V. CONCLUSION

For the reasons set forth above, the Court ORDERS as follows:

1.    Defendant's Motion to Dismiss and for Summary Judgment (ECF No. 43) is GRANTED to the extent set forth below:

      a.   Summary judgment is granted as to Claim 1 (sex discrimination in violation of Titles VII and IX), which is DISMISSED with prejudice;

      b.   The Court lacks subject-matter jurisdiction over Claim 2 (42 U.S.C. § 1983), which is DISMISSED without prejudice;

      c.   The Court declines to exercise supplemental jurisdiction over Claim 3 (breach of express contract) and Claim 4 (breach of implied

contract), which are DISMISSED without prejudice;

2.      Judgment shall enter in favor of Defendant and against Plaintiff; and Defendant

shall have its costs upon compliance with D.C.COLO.LCivR 54.1; and

3.      The Clerk shall terminate this action.

Dated this 10th day of February, 2021.

                                                    BY THE COURT:

                                                    _____
                                                    William J. Martinez
                                                    United States District Judge